In the

# United States Court of Appeals
## For the Seventh Circuit

───────────────

No. 19-3466

JULIUS EVANS,

*Petitioner-Appellee,*

*v.*

ALEX JONES,

*Respondent-Appellant.*

───────────────

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 14-cv-03930 — **Rebecca R. Pallmeyer**, *Chief Judge.*

───────────────

ARGUED SEPTEMBER 25, 2020 — DECIDED MAY 5, 2021

───────────────

Before RIPPLE, BRENNAN, and ST. EVE, *Circuit Judges.*

ST. EVE, *Circuit Judge.* An Illinois jury convicted Julius Evans of the first-degree murder of Moatice Williams, who was killed in a drive-by shooting in Chicago. Only one eyewitness—Andrew Jeffers—connected Evans to the shooting. Jeffers's account of the shooting dramatically changed over time. Jeffers initially only provided a few general identifying details of the shooter, and did not specifically identify any of the shooters. Eleven months later, however, the police

approached him while he was incarcerated and Jeffers then identified Evans as the shooter. Then, at trial, Jeffers recanted that identification: he testified that he did not see the identity of the shooter but had identified Evans because the police told him to.

During closing arguments, the prosecutor argued that Jeffers's trial testimony—that he did not see Evans shoot Williams—was false and the jury should disbelieve it because Jeffers only changed his story after being paid a visit by a defense investigator working for Evans's co-defendant, Mario Young, who was a known gang member. Evans appealed his conviction, asserting that the prosecutor's statements during closing argument deprived him of his right to a fair trial. He contended that the prosecutor's statements were improper because there was insufficient evidence in the record to support them, and that they were prejudicial because Jeffers's credibility was of the utmost importance given the lack of other evidence against Evans. The state appellate court concluded that there was sufficient evidence in the record to support the prosecutor's statements during closing argument, and so they were not improper.

Evans unsuccessfully petitioned the state court for post-conviction relief. He then filed a habeas petition in federal court, which the district court granted. Upon a close examination of the record and giving deference to the state appellate court's findings, we find that the state appellate court's determination that the prosecutor's statements were proper was objectively unreasonable. While we "do not lightly grant petitions for a writ of habeas corpus brought by state prisoners," *Cook v. Foster*, 948 F.3d 896, 899 (7th Cir. 2020), we agree with the district court that the facts of this case compel the

conclusion that Evans was deprived of his right to a fair trial and he is entitled to relief. We therefore affirm.

## I. Background

### A. Factual Background

On the evening of August 23, 1996, someone inside a vehicle opened fire on West Washington Street in Chicago. The bullets hit and instantly killed Moatice Williams, who had been sitting on his bicycle on the sidewalk. After arriving on the scene, Chicago Police Officer James Cianella interviewed two individuals who had witnessed the crime: Margaret Winton and Andrew Jeffers. Police did not identify any additional witnesses.

Winton told Officer Cianella that she had been selling goods across the street from Williams. Right before the shooting, she had observed Jeffers and a man named John "pitching quarters"—trying to see who could get the quarters closest to the line on the sidewalk—two or three feet from Williams. She then saw a gray car with tinted windows drive down the street, turn around the block, then proceed for a second time down West Washington Street. Someone then fired seventeen or eighteen gunshots from the front passenger-side window. Winton saw three men in the car (including the shooter) but did not see their faces and could not identify them.

Jeffers told Officer Cianella that he saw the vehicle stop and fire shots, and then drive east. There were three black men in the car, one of whom was wearing a white t-shirt. He did not provide any other identifying information.

**B. Investigation**

Eleven months later—in July 1997—two Chicago Police Department "Cold Case Squad" detectives visited Jeffers in prison to get his recollection of the shooting. Jeffers was serving a prison sentence for an unrelated drug offense at the time. At trial, the detectives testified that during this visit they showed Jeffers a six-person photo array and asked whether he recognized any of the individuals from the night of the shooting. By that stage of the investigation, the detectives had identified three primary suspects: Evans, Mario Young, and Royce Grant. Their photographs made up three of the six photos in the array. The detectives testified that Jeffers identified Evans and Young—Evans as the shooter and Young as the front seat passenger in the vehicle. Jeffers initialed the backs of the photographs of Evans and Young to certify having identified them.

Three months later, the detectives paid Jeffers another visit—this time, to a boot camp where Jeffers was serving the remainder of his prison sentence. Assistant State's Attorney Lorraine Scaduto accompanied. At trial, Scaduto testified that she showed Jeffers two photographs, one of Evans and one of Young. According to Scaduto, Jeffers again identified Evans as the shooter and Young as the vehicle's front passenger. Scaduto asked Jeffers to describe the events of the shooting and requested permission to transcribe his recollection into a written statement. Jeffers agreed.

According to Jeffers's written statement, on the night of the shooting he was pitching quarters with John across the street from where he lived on West Washington Street. The victim sat on his bicycle watching the game. Jeffers "bent down to pick up some quarters" and heard "four or five

gunshots." He looked up and "saw a gray Oldsmobile Cut-lass, two-door" driving slowly down the street. Jeffers saw three men in the car: one man was driving, another was lean-ing forward in the front passenger seat, so that the third man could reach over him and shoot toward the street from the front passenger window. The next day, Jeffers was pitching quarters with John again in the same location. Evans and Young—whom he recognized from the Oldsmobile Cutlass the day before—drove up in a different car. Evans apologized to John for having shot at him the day before, explaining that they mistakenly thought they were shooting at members of a rival gang. Jeffers signed the statement to certify that he had given the statement "freely and voluntarily and that no threats or promises were made to him in exchange for his statement."

The police arrested Evans, Young, and Grant on Novem-ber 14, 1997. A few weeks later, the detectives called upon Jef-fers to identify Evans and Young from an in-person lineup. Jeffers had been released from boot camp and was serving the remainder of his sentence on house arrest. At trial, a detective testified that Jeffers was shown a six-person lineup consisting of Evans, Grant, Young, and three non-suspects. The detective testified that Jeffers again identified Evans as the shooter and Young as the man sitting in the front seat.

Jeffers met with Assistant State's Attorney Ann Lorenz later that day. Lorenz asked Jeffers to tell her what he had wit-nessed in relation to the shooting. According to Lorenz, Jeffers recounted a version of events consistent with his written state-ment. Lorenz testified that she showed Jeffers two photo-graphs, one of Evans and one of Young. Jeffers confirmed to Lorenz that those were the men he saw in the Oldsmobile the

night Williams was murdered. Jeffers then testified before a grand jury that same day. His testimony was consistent with his handwritten statement.

**C. Trial Court Proceedings**

At Evans's trial in June 2000, Jeffers recounted a much different version of what had happened. Despite the accounts he gave during the investigation nearly three years prior, Jeffers testified at trial that although he was pitching quarters on West Washington Street at the time of the murder, he did not actually see the shooting. Instead, as soon as he heard gun shots, he ducked and did not look up again until after the firing stopped. He testified that he did not know the shots had been fired from a passing car, he did not see the car, and he certainly did not see who shot and killed Williams.

The prosecutor pressed Jeffers about the statements he gave the detectives and identifications he made of Evans and Young. Jeffers testified initially that he never identified photographs of Evans and Young, never signed a handwritten statement of his account of the shooting, and never met with Assistant State's Attorney Lorenz. Jeffers testified that he had never seen Evans before the trial.

Eventually, Jeffers admitted identifying Evans and Young from the lineup, but only because the detectives told him to, not because he recognized them from the night of the shooting. According to Jeffers, the detectives told him to "stick with the story, tell the story," but Jeffers did not elaborate further on the "story" he was told to "stick with." Jeffers testified that the story of what he saw was simple, he: "Be[nt] down pitch quarter, shots were fired. Ran across the street, called the ambulance. Ambulance came, detectives grabbed me, snatched

me, threw me in the car." Jeffers testified that any other details attributed to his story were made up by the detectives— "[t]hey added all that stuff on."

On cross-examination, Jeffers testified that he was not being given anything in exchange for his trial testimony, nor had anyone threatened him to testify a certain way. Jeffers testified again on redirect examination that no one threatened or intimidated him with respect to his trial testimony:

> Q:    It's your testimony today that no gang members or no one intimidated you into giving this testimony, is that right?
>
> A:    Right.

The prosecutor then asked Jeffers whether a private investigator working for Mario Young visited him before trial to speak with him about his testimony:

> Q:    But after you were released from boot camp you got a visit from someone working for Mario Young, the co-defendant, didn't you?
>
> A:    No.
>
> Q:    Didn't an investigator working for Mario Young's lawyer come to your home and ask you questions about what happened and talk to you about the shooting?
>
> A:    No.

On re-cross examination, defense counsel attempted to clarify Jeffers's testimony about whether he had spoken with an investigator working for Young:

Q:    The state's attorney just asked you if you spoke to an investigator for Mario Young when you were released from custody, is that correct, sir?

A:    When I was released from custody.

Q:    Right, when you were out.

A:    Right.

Q:    And did you tell them, did you stick with the story with that investigator, sir?

A:    No.

Q:    Pardon me, sir?

A:    No.

Q:    So you didn't tell that person what you told the grand jury, correct?

A:    Yeah.

Q:    Because you didn't stick with the story?

A:    Right.

On further direct examination, the prosecutor again asked if Jeffers had been visited by an investigator working for Young:

Q:    I thought you just said you don't remember being visited by an investigator for Mario Young, the co-defendant, after you were released from custody; didn't you just say that ten minutes ago?

A:    You asked me if she came to my house.

Q:    Who is it that came and visited you?

A:     Didn't no one come to my house.

Q:     Where did they visit you at?

A:     I don't remember. She didn't come to my house.

Q:     But you don't remember where?

…

A:     Whoever she was, she didn't come to my house, whatever you say.

Q:     But you know it was an [i]nvestigator who worked for Mario Young, the defendant in this case, didn't you?

A:     No.

Q:     You didn't know that?

A:     No.

Q:     Who did you think it was?

A:     I don't know who it was. She just asked me questions and I talked to her.

Q:     Asked you questions about the shooting, right?

A:     Yeah.

Q:     And that is when you decided to start saying that you didn't see who did the shooting, right?

A:     I told her the truth.

This concluded Jeffers's testimony. No further evidence was presented during trial about an investigator visiting Jeffers.

Before proceeding with closing arguments, the court informed the jury that "[c]losing arguments are made by the attorneys to discuss the facts and circumstances in the case and should be confined to the evidence and to reasonable inferences to be drawn from the evidence." It further instructed the jury that "[a]ny argument made by the attorneys which is not based on the evidence should be disregarded."

With Jeffers being the only witness able to identify the men involved in the shooting, the closing arguments centered on his credibility. The state's initial closing argument urged the jury to credit Jeffers's earlier statements over his trial testimony. Defense counsel argued the opposite—encouraging the jury to believe Jeffers's testimony that he did not witness the shooting and could not identify the shooter.

In the state's rebuttal closing argument, the prosecutor attempted to explain the change in Jeffers's testimony. The prosecutor argued that Jeffers provided very little information to law enforcement at the crime scene out of fear of retaliation by gang members. In the prosecutor's view, Jeffers only felt safe enough to tell the detectives what he witnessed and identify Evans when he was in state custody and "away from the street where the gang bangers dominate." The prosecution argued that the change in Jeffers's account could be traced to a visit from an investigator working for Young:

> Think about when the story changed. Andrew Jeffers didn't just identify Julius Evans and Mario Young one time. He identified him four times …. It only changed after he was released from custody when lo and behold he gets a visit from an investigator working for the lawyer for Mario Young, the defendant's co-offender.

Defense counsel objected and the court overruled the objection without explanation. The prosecutor continued:

> An investigator comes to visit him, and that person apparently interviews Andrew Jeffers. For what purpose? You can draw your own conclusion. Andrew Jeffers now knows when the investigator visits him they know how to find him.

The court overruled another objection, and the prosecutor went on:

> They know where he is at. The gang bangers that executed Moatice Williams on the street right next to him know how to find Andrew Jeffers. They can come and see him whenever they want. All of a sudden after getting a visit from an investigator working for them—

Defense counsel objected again and this time the court sustained. The prosecutor nonetheless continued:

> For Mario Young, his co-defendant, his co-offender, all of a sudden Andrew Jeffers can't remember his name. He can't remember a damn thing. ... What a surprise. What a surprise that Andrew Jeffers after being visited by Mario Young's investigator would suddenly forg[e]t everything that he saw when–on the night of August 23, 1996, when Moatice Williams was gunned down by this defendant. ... That's why Andrew Jeffers was such a pain when he was on the witness stand yesterday. You can draw your own conclusions. Andrew Jeffers now knows

that Mario Young or his investigator knows
how to find Andrew Jeffers.

The prosecutor made a last attempt to bolster Jeffers's out-of-court statements, and after the court overruled another objection, he asserted:

> Andrew Jeffers was one hundred percent sure
> and entirely consistent in his identifications of
> what happened and who he saw do it … until
> he was paid a visit by Mario Young's investiga-
> tor … that's when suddenly he started to los[e]
> his memory which is not a big surprise or
> shouldn't be a big surprise to anybody.

The prosecutor concluded and the court instructed the jury. With respect to the parties' closing statements, the court stated:

> Closing arguments are made by the attorneys to
> discuss the facts and circumstances in the case
> and should be confined to the evidence and to
> reasonable inferences to be drawn from the evi-
> dence. Neither opening statements nor closing
> arguments are evidence. Any statement or argu-
> ment made by the attorneys which is not based
> on the evidence should be disregarded.

The jury issued a guilty verdict the following day. The trial court sentenced Evans to life in prison.

### D. Direct Appeal

Evans appealed his conviction to the Illinois Appellate Court. He argued that the prosecution engaged in misconduct by arguing in its rebuttal closing statement that an

investigator working for Evans's co-defendant, Mario Young, caused Jeffers to recant his earlier statements.[1] The appellate court upheld the conviction.

The state appellate court determined that the prosecutor "did not invent an allegation of witness intimidation without any basis in the record." Instead, the prosecutor "made a reasonable inference from the evidence which demonstrated that Jeffers dramatically changed his testimony at trial after receiving a visit from an investigator sent by codefendant Young, a known gang member." Finding adequate support in the record for the prosecutor's comments, the appellate court held the statements did not substantially prejudice Evans.

The appellate court reasoned the record reflected that Jeffers identified Evans as the shooter on multiple occasions, provided a written statement describing what he witnessed on the night of the murder, testified against Evans before a grand jury, and only "abruptly recanted after being visited by an investigator sent by codefendant Young." The state court interpreted trial testimony as reflecting that "Jeffers admitted that he did, in fact, meet with [Mario Young's] investigator."

The court further reasoned that Jeffers's explicit testimony that he was not threatened by Evans did not render improper the prosecutor's inference that Young's investigator caused Jeffers to recant his prior statements at trial. As an initial matter, the court explained, Jeffers "did not state, nor was he asked, whether he was threatened by the investigator." More importantly to the appellate court, the record reflected that

---

[1] Evans also appealed his conviction on other grounds that are no longer at issue. Accordingly, we will not discuss them further.

"Jeffers identified defendant as the shooter in this case on five separate occasions and that his testimony only changed after he was released from custody and visited by an investigator." Given that "the investigator was sent by codefendant Young," and Evans and Young "worked together to murder the victim," the prosecutor reasonably invited the jury "to infer that Jeffers's reluctance to testify was the result of fear invoked by the investigator's visit."

Evans filed a petition for leave to appeal, and the Illinois Supreme Court denied his petition without comment on December 5, 2002.

### E. Post-Conviction Proceedings

After unsuccessfully petitioning the state courts for post-conviction relief, Evans filed a pro se petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 in federal court. As relevant to this appeal, Evans argued that the prosecutor's references to Young's investigator deprived him of his right to a fair trial. After appointing Evans counsel, the district court agreed and granted Evans's petition. According to the court, it was objectively unreasonable for the state court to conclude that the prosecutor's statements were supported by the record or based on a reasonable inference of the evidence in the record. The court thus determined that the statements were improper and potentially prejudicial, and had deprived Evans of his right to a fair trial. This appeal followed.

## II. Discussion

We review the district court's grant of a habeas petition de novo, "but our inquiry is an otherwise narrow one." *Schmidt v. Foster*, 911 F.3d 469, 476 (7th Cir. 2018) (en banc). Under the Antiterrorism and Effective Death Penalty Act of 1996

(AEDPA), a federal court may grant habeas relief only when a state court adjudication on the merits: (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. §§ 2254(d)(1), (2). Only Supreme Court precedent—not circuit court precedent—constitutes clearly established federal law in § 2254 habeas cases. *See Parker v. Matthews*, 567 U.S. 37, 48–49 (2012). A state court unreasonably applies clearly established federal law if it "correctly identifies the governing legal rule from Supreme Court case law, but unreasonably applies it to the facts of the case." *Clark v. Lashbrook*, 906 F.3d 660, 664 (7th Cir. 2018).

*Darden v. Wainwright*, 477 U.S. 168 (1986), provides the clearly established federal law for Evans's prosecutorial misconduct claim.[2] *See Parker*, 567 U.S. at 45. Under *Darden*, a prosecutor's improper statements deprive a criminal defendant of his right to a fair trial if the remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at 181 (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). A defendant seeking relief under *Darden* embarks on an "uphill battle; 'improper statements during closing arguments rarely constitute

---

[2] The Illinois Appellate Court did not explicitly cite *Darden* in its analysis of Evans's prosecutorial misconduct claims—instead, it relied on state-court precedent to conduct a *Darden*-like analysis. We agree with the district court that the state court's failure to specifically discuss *Darden* does not negate the applicability of *Darden* to this case. *See Evans v. Lashbrook*, 2019 WL 6117585 at *6 n.7 (N.D. Ill. Nov. 18, 2019) (citing *Ruvalcaba v. Chandler*, 416 F.3d 555, 565 (7th Cir. 2005)).

reversible error.'" *United States v. Klemis*, 859 F.3d 436, 442 (7th Cir. 2017) (quoting *United States v. Wolfe*, 701 F.3d 1206, 1211 (7th Cir. 2012)).

*Darden* is a "highly generalized standard," *Parker*, 567 U.S. at 49, and its application "can demand a substantial element of judgment." *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). Our analysis in this case thus requires that we acknowledge that "[t]he more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Id.* We also note, however, "[e]ven in the context of federal habeas, deference does not imply abandonment or abdication of judicial review." *Miller-El v. Cockrell*, 537 U.S. 322, 324 (2003).

In applying *Darden*, we must "first look to the challenged comments to determine whether they were improper." *Ellison v. Acevedo*, 593 F.3d 625, 636 (7th Cir. 2010). Only if the statements are improper must we decide if they "so infected the trial with unfairness" as to have denied the defendant his due process right to fair trial. *Id.* (quoting *Darden*, 477 U.S. at 181).

## A. Whether the Prosecutor's Statements were Improper

It is well established that a prosecutor may not reference facts not before the jury to bolster a witness's credibility. *See United States v. Alviar*, 573 F.3d 526, 542 (7th Cir. 2009). A prosecutor may, however, "argue reasonable inferences from the evidence that the jury has seen and heard." *United States v. Waldemer*, 50 F.3d 1379, 1383 (7th Cir. 1995).

Evans challenges seven statements from the prosecutor's rebuttal closing argument as improper. The essence of each challenged statement is the same: the prosecutor argued that Jeffers recanted his identification of Evans as the shooter during his trial testimony because an investigator working for co-

defendant Mario Young visited him before that testimony. The prosecution implied that the visit intimidated Jeffers because Young now knows where he lives. According to Evans, these statements were improper because there is no evidence in the record from which the prosecutor could reasonably infer that an investigator who worked for Young visited Jeffers.

The Illinois Appellate Court disagreed and concluded that the prosecutor's remarks were proper because Jeffers had testified that he did, in fact, meet with an investigator sent by Young. Upon closely examining the content of Jeffers's testimony, however, we conclude that the Illinois Appellate Court's finding that Jeffers so testified misstates the record and lacks evidentiary support. We thus agree with Evans that the state appellate court's determination that the prosecutor's comments were proper is objectively unreasonable.

When Jeffers was initially questioned by the prosecutor about a visit from an investigator working for Young, he twice explicitly denied such a visit occurred. Later, on re-cross, Evans's counsel asked Jeffers if he recalled the prosecutor's questions. In response, Jeffers testified that he did, in fact, meet with someone about the shooting, but he did not testify that the person was an investigator sent by Young. On further redirect, the prosecutor questioned Jeffers about why he originally denied that he was visited by an investigator who worked for Young. Jeffers testified that he spoke to a woman about the case, but that he did not know who she was:

> Q:    But you know it was an [i]nvestigator who worked for Mario Young, the defendant in this case, didn't you?
>
> A:    No.

Q:      You didn't know that?

A:      No.

Q:      Who did you think it was?

A:      I don't know who it was. She just asked
me questions and I talked to her.

The Illinois Appellate Court acknowledged that Jeffers in-itially denied being visited by an investigator who worked for Young. Nonetheless, it determined that during re-cross, Jef-fers admitted that he spoke to an investigator who worked for Young. This interpretation mischaracterizes Jeffers's testi-mony on re-cross and seemingly ignores his clarification on re-direct that he did not know who the investigator was or who she worked for. While Jeffers admitted to speaking with an investigator, he repeatedly denied that this investigator worked for Young. The Illinois Appellate Court's finding to the contrary lacks evidentiary support, and so its determina-tion that the prosecutor's comments were based on a reason-able inference from Jeffers's testimony—and so were proper—is objectively unreasonable.

First, focusing on Jeffers's testimony on re-cross, we rec-ognize that his indirect responses to certain of defense coun-sel's questions make the transcript somewhat difficult to fol-low. But there is no reasonable reading of this exchange in which Jeffers admits to speaking with an investigator work-ing for Mario Young. Instead, the testimony establishes only that Jeffers spoke to *an* investigator to whom he told the "story" consistent with his testimony at trial, and inconsistent with his prior statements to police.

Second, even if Jeffers's testimony on re-cross was ambig-uous as to whether the investigator worked for Young, his

testimony on re-direct clarified the issue. The prosecutor asked Jeffers why he had previously denied being visited by an investigator who worked for Young. Jeffers explained that he had spoken to a woman about the case but flatly denied that he had any knowledge that she had a connection to Young. The Illinois Appellate Court seemingly did not take this testimony into account.

In fact, Jeffers explicitly denied having met with an investigator who worked for Young five separate times. Nonetheless, the state appellate court weighed his testimony on re-cross—in which he never explicitly stated the investigator worked for Young—over his clear and repeated denials that such a visit occurred. The Illinois Appellate Court's determination that Jeffers testified that he met with an investigator who worked for Young therefore is not supported by the trial evidence.

The state appellate court's conclusion that the prosecutor's comments were proper depended on its determination that Jeffers had testified that an investigator who worked for Young visited him. According to the state appellate court, because there was evidence in the record that Jeffers had "dramatically changed his testimony at trial after receiving a visit from an investigator sent by codefendant Young, a known gang member," the prosecutor's statements during closing argument were proper because the prosecutor made a reasonable inference that the change in Jeffers's testimony could be attributed to witness intimidation. When Jeffers's testimony, however, is properly characterized—that he met with an investigator but had no knowledge as to whom the investigator worked for—the prosecutor's comments no longer rest on a reasonable inference from the evidence in the record. Without

evidence connecting the investigator to Young, it was not reasonable for the prosecutor to argue that Jeffers changed his testimony after a visit from an investigator who worked for Young because Jeffers feared that Young knew where to find him. While the record does not reflect who the investigator was or who she worked for, the only testimony about her employer is that she did *not* work for Young. Close examination of the record reveals that the state court mischaracterized and misstated the content of Jeffers's testimony. The prosecutor's statements during closing argument about witness intimidation were therefore improper because the record did not support them, nor do they reflect a reasonable inference from the record. The state appellate court's determination to the contrary therefore reflects an unreasonable application of *Darden*.

On appeal, the state makes two primary arguments. First, the state argues that because both the prosecutor and defense counsel characterized the investigator as working for Young, "both sides agreed that the person who spoke to Jeffers worked for Young" and the record is therefore susceptible to multiple interpretations. But even if the attorneys shared the implicit assumption that the investigator worked for Young, this shared belief is not evidence and does not introduce ambiguity into Jeffers's clear and repeated denials that he spoke to an investigator who worked for Young.

Second, the state argues that because Jeffers admitted he spoke to an investigator, it was proper for the prosecutor to link that investigator to Young because the investigator must have been working for the defense. In the state's view, this must be true because Evans "does not contend that this investigator worked for the State, nor could he, as it was a *defense* investigator who approached Jeffers." The state makes this

circular contention without citation to the record. A lack of evidence that the investigator worked for the state does not constitute evidence that the investigator worked for the defense. It is precisely the lack of evidence about who the investigator worked for that makes the prosecutor's comments improper. Evans does not need to prove the investigator worked for the state to successfully argue that there was no evidence in the record from which the prosecutor could reasonably infer that the investigator worked for Young. And without evidence linking the investigator to the defense, the prosecutor's statements about why Jeffers's testimony changed—that he was paid a visit by an investigator hired by a known gang member who now knew where to find him—was not a reasonable inference.

Accordingly, the Illinois Appellate Court's determination that the prosecutor's statements were supported by the record, and therefore proper, was unreasonable. The dissent suggests that we have reached this conclusion without considering Jeffers's testimony about the investigator in the context of the entire trial. In doing so, however, it is the dissent which applies too narrow a lens to its analysis. The dissent hangs its hat on a single exchange in which defense counsel inquired whether "[t]he state's attorney *just asked* if [Jeffers] spoke to an investigator for Mario Young" and Jeffers responded, "Right." (emphasis added). In the dissent's view, this was an affirmative response that can reasonably be viewed as affirming either that he was just asked that question *or* that he in fact spoke to an investigator working for Mario Young. Because both of these inferences are possible, the dissent argues that the prosecutor's statement in closing argument that Jeffers spoke to an investigator working for Young is a "logical conclusion."

But that conclusion is only logical if one ignores the content and context of the defense counsel's question, Jeffers's answer, Jeffers's previous denial that he spoke to such an investigator, and his subsequent clarification that he spoke to someone but he did not know if the investigator worked for Young (and did not know who she worked for). This context is not "an exercise in keeping score," as the dissent suggests. Our determination that the prosecutor's remarks were not based on a reasonable inference from record evidence is not based on the fact that Jeffers denied that he met with an investigator working for Young more times than he admitted it. Rather, in considering Jeffers's full testimony, we do not find such an inference of admission reasonable. Interpreting Jeffers's answer of "right" to a question about whether the state's attorney had just asked a question as an affirmation about the very thing that he had just twice denied is not reasonable, especially considering his subsequent clarifications.

Rather than relying solely on Jeffers's style of speaking to search for reasonable alternative inferences that might be drawn from his testimony, as the dissent proposes, we base our conclusion on the *facts* to which Jeffers did or did not testify. Jeffers specifically did not admit to having spoken with Mario Young's investigator, and he expressly stated the opposite: he did not speak to an investigator who worked for Mario Young. We decline the dissent's invitation to base our decision on each of these facts in isolation, and instead consider the trial record in full. It was unreasonable for the Illinois Appellate Court to ignore Jeffers's explicit testimony which establishes only that he spoke with a female investigator, and that no one threatened him prior to testifying at trial. Because there was no evidence in the record as to whom the investigator worked for, there was insufficient evidence presented at

trial to support the prosecutor's arguments that Jeffers's testimony changed because a defense investigator working for a known gang member visited him. While "[i]t is of course true that in closing counsel may make arguments reasonably inferred from the evidence presented," at some point "the inference asked to be drawn will be unreasonable enough that the suggestion of it cannot be justified as a fair comment on the evidence." *United States v. Vargas*, 583 F.2d 380, 385 (7th Cir. 1978) (holding that a prosecutor's closing statement that the defendant had previously trafficked heroin was not based on a reasonable inference from the evidence presented because "the only testimony on the subject was [the defendant's] unrebutted statement that he had no prior criminal record"). That is precisely what occurred here. There was thus no reasonable basis for the state appellate court to conclude that the prosecutor's comments in his closing statement were proper.

## B. Whether the Prosecutor's Statements Violated Due Process

Having found the challenged statements improper, we turn to whether—considering the record as a whole—the prosecutor's comments deprived Evans of a fair trial. "The relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *United States v. Olson*, 450 F.3d 655, 674 (7th Cir. 2006) (quoting *Darden*, 477 U.S. at 181). Six factors guide our inquiry: (1) whether the prosecutor misstated evidence; (2) whether the remarks implicate specific rights of the accused; (3) whether the defense invited the comments; (4) the trial court's instructions; (5) the weight of the evidence against the defendant; and (6) the defendant's opportunity to rebut the improper remarks. *See Darden*, 477 U.S.

at 181; *see also Howard v. Gramley*, 225 F.3d 784, 793 (7th Cir. 2000). We do not apply these factors in a rigid manner and rely on them only as a "guide to determine whether there was fundamental unfairness that infected the bottom line." *Hough v. Anderson*, 272 F.3d 878, 903 (7th Cir. 2001). We generally consider the weight of the evidence to be "the most important consideration." *Id.* (quoting *United States v. Morgan*, 113 F.3d 85, 90 (7th Cir. 1997)).

As an initial matter, the parties disagree about the level of deference we owe the state appellate court's determination that Evans was not denied the right to a fair trial. Evans argues that a *Darden* analysis has two prongs because "we first determine if the comments were … improper" and then "[i]f they were improper, we consider the record as a whole to determine whether the comments deprived the defendant of a fair trial." *Olson*, 450 F.3d at 673. According to Evans, because the state appellate court never reached the second prong—it determined only that the comments were proper—we should consider whether Evans was denied the right to a fair trial de novo. In support, Evans cites to how federal courts review ineffective assistance of counsel claims arising under *Strickland v. Washington*, 466 U.S. 668 (1984). A *Strickland* claim has two prongs—a petitioner must show both that his counsel provided constitutionally deficient performance (the "performance" prong) and that her was prejudiced by it (the "prejudice" prong). When a state appellate court denies post-conviction relief based on a petitioner's failure to meet one prong but does not reach the merits of the other prong, federal courts review the unreached prong de novo. *See Wiggins v. Smith*, 539 U.S. 510, 534 (2003). Thus, in Evans's view, because the state appellate court made "no determination" about whether the prosecutor's comments (if improper) prejudiced him, we

need not defer to state court's determination that he was not deprived the right to a fair trial.

Conversely, the state argues that, unlike *Strickland*, *Darden* did not set forth a dual-pronged inquiry but instead articulated a "very general" standard. *Parker*, 567 U.S. at 48. We have interpreted *Darden* as having "established a two-prong test for determining whether a prosecutors' comments in closing argument constitute a denial of due process." *Ellison*, 593 F.3d at 635–36. Nevertheless, according to the state, the reasonableness of the state appellate court's adjudication turns on clearly established Supreme Court precedent, and there is no such precedent establishing a dual-pronged analysis.

We need not decide this question to resolve this case. As described below, even if we owe deference to the state appellate court's determination, the prosecutor's comments deprived Evans of a fair trial and any decision to the contrary would be an unreasonable application of *Darden*.

To be sure, not all of *Darden*'s factors weigh in Evans's favor. Specifically, the remarks did not "implicate other specific rights of the accused such as the right to counsel or the right to remain silent," *see Darden*, 477 U.S. at 182, and the trial court instructed the jury to disregard any argument made by the attorneys that is not based on evidence.[3] Yet the remaining four factors tip the scale heavily enough to require that we

---

[3] Evans concedes that the only "specific right" arguably implicated in the prosecutor's remarks is the defendant's right to investigate the case against him. *See Michigan v. Harvey*, 494 U.S. 344, 348 (1990). That right is not implicated here, however, as the prosecutor's comments concerned an investigator allegedly working for Evans's co-defendant, Mario Young, not Evans himself.

conclude that the prosecution's improper statements deprived Evans of his right to a fair trial.

As we have already explained, the prosecutor's comments misstated the evidence. At no point does Jeffers testify that he spoke with an investigator working for Mario Young. Instead, he testified to the opposite: no one threatened or intimidated him, and he never spoke with an investigator working for Mario Young. The defense did not invite the prosecutor's remarks, either. In other words, the prosecutor's comments cannot be seen as offsetting "improper statements from the defense that might have disposed the jury to favor the defendant's position," *United States v. Alexander*, 741 F.3d 866, 871 (7th Cir. 2014), because the defense did not make such improper statements. The timing of the statements is particularly concerning, because the prosecution made the improper remarks during rebuttal closing statements—the very last time either party would address the jury.

Most significant to our analysis, however, is the weight of the evidence against Evans. The evidence here was not "plentiful and compelling" as it was in *United States v. Klemis*, 859 F.3d 436, 443 (7th Cir. 2017), where "multiple witnesses" testified against the defendant, and phone and text records documented the defendant's crime. Instead, the prosecution's *only* evidence linking Evans to the shooting is Jeffers's identifications. The only other eyewitness, Margaret Winton, was certain she never saw the shooter's face and could not describe him or either of the other two men in the car. In addition, no physical evidence retrieved from the scene of the crime was traced to Evans.

The state contends that the prosecutor's remarks were not prejudicial because the jury would have found Jeffers's

"multiple out-of-court identifications" to be more credible than his trial testimony regardless. We are not persuaded. When Jeffers was first asked to identify the perpetrators, he had a 50% chance of picking one of the three people the police already suspected. In the next meeting, Jeffers was shown a photo of Evans again. Therefore, by the time Jeffers picked Evans out of an in-person lineup, he had seen his photo—and not the photo of any other person in the lineup—twice. Thus, the fact that Jeffers "identified" Evans multiple times before trial does not mean the evidence against him was compelling.

Rather, the prosecution's case rested heavily on a witness who initially did not provide specific details of the shooting, then told one version of events before trial and a completely different version of events at trial. Given the lack of other evidence tying Evans to the shooting, which version the jury believed was crucial to the outcome. Consequently, any reason the jury had to credit one version over the other was likely to be influential. The prosecutor made Jeffers's pre-trial version of events appear more credible to the jury than his trial testimony by arguing that Jeffers had been threatened by an investigator working for Evans's co-defendant, when there was no evidence in the record supporting that argument. The state appellate court acknowledged that "prosecutorial comments which suggest that a witness is afraid to testify truthfully because of threats or intimidation by the defendant or on the defendant's behalf, when not based upon evidence in the record, are highly prejudicial." This is exactly what occurred here. Accordingly, the prosecutor's improper comments deprived Evans of his right to a fair trial.

AFFIRMED

BRENNAN, *Circuit Judge*, dissenting. The habeas petition before us focuses on the closing argument of the prosecutor, who theorized that a key witness, Andrew Jeffers, changed his testimony because he was intimidated by an investigator working for a co-defendant. The parties examine Jeffers's trial testimony to assess whether the prosecutor's remarks were reasonably inferred from the trial evidence. My colleagues conclude they are not, and therefore grant the habeas petition.

Viewing the entire trial, I read Jeffers's testimony as admitting that he spoke with the investigator. That means the prosecutor's closing argument was properly grounded in the trial evidence, and the Illinois Appellate Court's decision reasonably applied clearly established federal law. Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 110 Stat. 1214, we should defer to that decision.

## I

A foundational principle of our federal system remains that "[s]tate courts are adequate forums for the vindication of federal rights." *Burt v. Titlow*, 571 U.S. 12, 19 (2013). Congress enacted AEDPA to ensure that federal habeas review of state court adjudication is "narrow … and not the broad exercise of supervisory power." *Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974) (internal quotation marks omitted). Under AEDPA, a federal court does not have authority to issue a writ of habeas corpus unless the state court decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

A state court unreasonably applies clearly established federal law if "it correctly identifies the governing legal rule from Supreme Court case law, but unreasonably applies it to the facts of the case." *Clark v. Lashbrook*, 906 F.3d 660, 664 (7th Cir. 2018) (citing *Williams v. Taylor*, 529 U.S. 362, 407–08 (2000)). A federal court reviewing habeas under the "unreasonable application" prong of § 2254(d)(1) must first "determine what arguments or theories supported or, … could have supported, the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). The court then must ask "whether fairminded jurists could disagree on the correctness of the state court's decision if based on one of those arguments or theories." *Shinn v. Kayer*, 141 S. Ct. 517, 524 (2020) (internal quotation marks omitted) (citing *Richter*, 562 U.S. at 101). A petitioner can satisfy this inquiry "only by showing that 'there was no reasonable basis'" for the state court's decision. *Cullen v. Pinholster*, 563 U.S. 170, 188 (2011) (quoting *Richter*, 562 U.S. at 98). The state court's factual determination is "presumed to be correct," and the petitioner bears the burden of rebutting that presumption "by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

AEDPA sets a high bar for when a state court decision constitutes an unreasonable application of Supreme Court precedent. To meet this bar, a state court decision must be "so lacking in justification … beyond any possibility for fairminded disagreement." *Schmidt v. Foster*, 911 F.3d 469, 477 (7th Cir. 2018) (en banc) (quoting *Richter*, 562 U.S. at 103). Habeas relief is appropriate solely when "state courts veer well outside the channels of reasonable decision-making about federal constitutional claims." *Id.* (internal quotation marks omitted). This standard is "difficult to meet." *White v. Woodall*, 572 U.S. 415, 419 (2014) (internal quotation marks omitted). That is because

AEDPA deference directs federal courts to "presum[e] that state courts know and follow the law." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam).

The clearly established federal law in this case, *Darden v. Wainwright*, provides the relevant "framework to evaluate 'whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Bartlett v. Battaglia*, 453 F.3d 796, 800 (7th Cir. 2006) (quoting *Darden*, 477 U.S. at 181). To succeed under *Darden*, a petitioner must prove that the prosecutor's remarks were improper and that those statements deprived him of a fair proceeding. *Darden*, 477 U.S. at 181.

A prosecutor's closing remarks unsupported by trial evidence are improper. *See Berger v. United States*, 295 U.S. 78, 88–89 (1935). Federal courts defer to state courts in making this assessment. *Cf. Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). A state appellate court's decision that prosecutorial statements were supported by evidence "will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Id.* This deference is necessary because "[a] criminal trial does not unfold like a play with actors following a script," *Geders v. United States*, 425 U.S. 80, 86 (1976), and habeas review cannot take into account all the nuances of live testimony. Though "reasonable minds reviewing the record might disagree about the finding in question, on habeas review that does not suffice to supersede the trial court's" determination. *Brumfield v. Cain*, 576 U.S. 305, 314 (2015) (cleaned up). So "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Richter*, 562 U.S. at 102.

A prosecutor may comment on the credibility of a witness if the remarks were reasonably inferred from the evidence at trial. *United States v. Klemis*, 859 F.3d 436, 443 (7th Cir. 2017). This court has recognized that "[a]ttorneys have more leeway in closing arguments to suggest inferences based on the evidence." *Soltys v. Costello*, 520 F.3d 737, 745 (7th Cir. 2008). A prosecutor's inference "need not always be introduced, nor immediately followed, by a direct reference to the trial record." *United States v. Wolfe*, 701 F.3d 1206, 1213 (7th Cir. 2012). Rather, reasonable inference must be "defined contextually." *United States v. Waldemer*, 50 F.3d 1379, 1384 (7th Cir. 1995). That context should dispose of this case.

## II

The appropriate context from which the prosecutor may render a reasonable inference is the entire trial, not just portions of it. *See United States v. Young*, 470 U.S. 1, 11–12 (1985) (explaining that prosecutor's comments or conduct must be viewed in "the context of the entire trial").

That context includes the following exchanges. On the first re-direct examination, the prosecutor asked Jeffers whether he had spoken to an investigator working for Young. Jeffers answered no. On re-cross, defense counsel followed up and this time Jeffers admitted that he did speak to an investigator. Then the prosecutor readdressed Jeffers's encounter with the investigator. Jeffers responded that he did not know the identity of the investigator and that the investigator did not visit his home. In his closing argument, the prosecutor offered a theory on why Jeffers recanted. He theorized that Jeffers had given a complete story when he was in custody because he felt safe, and later recanted his testimony upon a visit from Young's investigator because he was intimidated.

Based on this sequence, all can agree that Jeffers spoke to an individual who had visited him after he was released from custody but before trial. And all can agree that the individual was likely an investigator. What is unclear, the majority opinion concludes, is whether Jeffers knew that the investigator was someone working for Young.

The majority opinion rejects the decision of the Illinois Appellate Court—that Jeffers admitted to speaking with Young's investigator—as lacking evidence, pointing to portions of Jeffers's testimony. On re-cross, defense counsel asked Jeffers, "The state's attorney just asked if you spoke to an investigator for Mario Young when you were released from custody, is that correct, sir?" Jeffers responded, "Right." Though the majority opinion acknowledges that Jeffers's responses at various parts of the testimony "make the transcript somewhat difficult to follow," it surmises that "there is no reasonable reading of *this* exchange in which Jeffers admits to speaking with an investigator working for Mario Young." (emphasis added).

The context of the full trial weakens this conclusion. Throughout the trial, Jeffers used "right" and "yeah" interchangeably to answer in the affirmative.[1] So when he replied

---

[1] Below are some examples from Jeffers's testimony:

"Q: As of '96 when this happened, you had been living there for about five or six years? A: Right." R. 13-8 at 89–90.

"Q: You're saying you heard a total of four or five shots altogether? A: Right. Q: That is all you heard? A: Right." *Id.* at 95.

"Q: You don't write your name that way, AJ? A: Right." *Id.* at 104.

to defense counsel's question on re-cross with "right," Jeffers could have meant either:

> 1. Yes, it is correct that the state's attorney just asked if I spoke to an investigator for Mario Young when I was released from custody; or
> 2. Yes, it is correct that I spoke to an investigator for Mario Young when I was released from custody.

The first inference focuses on the state attorney's *question*; the second inference focuses on the *substance* of that question. Both are reasonable readings of the exchange, and the latter provides a reasonable basis to infer that Jeffers admitted to speaking with an investigator working for Young.

The point of the "reasonable inference" standard is to capture the nuances of the trial—what parties attempt to communicate and to understand. From Jeffers's testimony, it can logically be concluded that he spoke to Young's investigator. Inference number 1 is reasonable, but that does not render inference number 2 unreasonable. Indeed, given the sequence of the questions, inference number 2 is arguably more reasonable than inference number 1.

The majority opinion concludes that the state court's determination "lacks evidentiary support." In doing so, it highlights that there is "[a] lack of evidence about who the

---

"Q: And on the bottom of page 6 it says Andrew Jeffers there, right? A: Right. Q: And you're saying you didn't put that signature there either, right? A: Yeah." *Id.* at 108.

"Q: And you didn't put that there either, right? A: Right. Q: And two lines below that, right? A: Yeah." *Id.* at 112.

investigator worked for" and that "the only testimony about her employer is that she did *not* work for Young."

But by dismissing the state court's interpretation of the testimony, the majority opinion applies an overly restrictive definition of "reasonable inference." To be a "reasonable inference" does not require Jeffers to have explicitly said that he knew the investigator worked for Young. *Black's Law Dictionary* defines "inference" as "[a] conclusion reached by considering other facts and deducing a logical consequence from them." BLACK'S LAW DICTIONARY (11th ed. 2019). That Jeffers spoke to Young's investigator is a logical conclusion:

- Jeffers decided to recant his prior statements and identification after his release from custody and before trial; an investigator visited Jeffers during that time;
- Young had an interest in the case as a co-defendant; and
- Jeffers responded in the affirmative when defense counsel asked whether he had spoken to an investigator working for Young.

In response to this conclusion, the majority opinion underscores that five times Jeffers denied meeting with Young's investigator. Such denials do not automatically amount to clear and convincing evidence. This is especially true if the state court renders its factual determination based on a reasonable inference from the trial record, as the Illinois Appellate Court did here.

Evaluating whether an inference is reasonable is not an exercise in keeping score. Five explicit denials do not obviate the weight of a single inference of admission to the contrary. *Cf.*

*United States v. Edwards*, 581 F.3d 604, 612 (7th Cir. 2009) (noting that "the trier of fact must consider whether … particular falsehoods in a witness's testimony so undermine his credibility as to warrant disbelieving … a critical part" of his testimony); *United States v. Mejia*, 82 F.3d 1032, 1038 (11th Cir. 1996) ("A proper inference the jury can make from disbelieved testimony is that the opposite of the testimony is true.").

One last point on this score. The majority opinion emphasizes that Jeffers "expressly stated … he did not speak to an investigator who worked for Mario Young." But Jeffers only denied knowing the identity of the investigator who "just asked [him] questions," not speaking with an investigator. Indeed, the majority opinion acknowledges that Jeffers said he "spoke to someone but he did not know if the investigator worked for Young." Jeffers neither did nor could have expressly denied speaking with Young's investigator because he did not know that investigator's identity.

AEDPA "demands that state-court decisions be given the benefit of the doubt." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (quoting *Woodford*, 537 U.S. at 24). The Illinois Appellate Court's decision does not simply "rest[] on thin air." *Mendiola v. Schomig*, 224 F.3d 589, 592 (7th Cir. 2000). It relies on a reasonable inference from evidence presented at trial—that Jeffers admitted to speaking with an investigator working for Young—to conclude that the prosecutor's comments were not improper. And when the record is subject to multiple interpretations, as here, federal courts should defer to state court's reasonable interpretation. *See, e.g., Bartlett*, 453 F.3d at 802. Because the full context of the trial provides a reasonable basis to characterize the prosecutor's statements as not improper,

the Illinois Appellate Court did not unreasonably apply *Darden* under § 2254(d)(1). We should defer to the state court's decision, and bound by AEDPA, deny the petition.

* * *

Under AEDPA, federal courts must not mistake habeas corpus as "a substitute for ordinary error correction through appeal." *Richter*, 562 U.S. at 102–03. Rather, it is "[a] guard against extreme malfunctions in the state criminal justice systems." *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring in judgment). No such breakdown happened here. The decision of the Illinois Appellate Court rested on record evidence, so under AEDPA I would deny the petition. I respectfully dissent.