In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 23-1557

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

TODD SHEFFLER,

*Defendant-Appellant.*

———————————

Appeal from the United States District Court for the
Central District of Illinois.
No. 3:19-CR-30067 — **Sue E. Myerscough**, *Judge.*

———————————

ARGUED SEPTEMBER 4, 2024 — DECIDED JANUARY 8, 2025

———————————

Before ROVNER, BRENNAN, and LEE, *Circuit Judges.*

BRENNAN, *Circuit Judge.* Correctional officers at an Illinois state prison brutally beat inmate Larry Earvin, who died from his injuries. For their part in his killing and its cover-up, Todd Sheffler and two others were charged with various federal crimes. Following a mistrial, Sheffler was retried and a jury found him guilty.

On appeal, Sheffler argues there was not a reasonable likelihood that an incident report he wrote and an interview he gave to the state police would reach federal officials. So, he submits, he could not have violated two federal statutes underlying some of his convictions: 18 U.S.C. § 1512, prohibiting witness tampering, and 18 U.S.C. § 1519, forbidding falsifying records in a federal investigation.

Sheffler also asserts the district court incorrectly ruled that he had breached a proffer agreement, as well as erroneously allowed a biased juror to sit on his trial. He further maintains that in the rebuttal closing argument, the prosecutor impermissibly attacked his lawyer, misconstrued evidence, and inappropriately commented on his right to silence. For all these reasons, Sheffler challenges the district court's denial of his motion for a new trial.

We affirm because sufficient evidence supported Sheffler's convictions, and neither the district court nor the prosecutor committed any reversible errors.

## I. Background

Sheffler appeals his criminal convictions after a jury trial, so we review the evidence in the light most favorable to the prosecution. *United States v. Resnick*, 823 F.3d 888, 893 (7th Cir. 2016). We describe the beatings Earvin suffered that led to his death, Sheffler's actions during the subsequent investigation, the charges against him, a proffer agreement into which he entered before his first jury trial, and the events and rulings at his second jury trial.

*The beatings.* The events in this case took place at the Western Illinois Correctional Center in Mt. Sterling, Illinois. On May 17, 2018, Earvin refused to lock up at a correctional

officer's request. In response, officers attempted to handcuff Earvin. He resisted and a scuffle ensued in which an officer received a minor injury. This occurred in the prison's R1 building in the D Wing.

An alert was called out that staff was in distress, and more than 20 officers arrived on the scene. Earvin was escorted out of D Wing with officers Alex Banta and Willie Hedden holding his arms. They walked into the R1 vestibule, a "blind spot" not covered by security cameras. There, Banta began to kick and punch Earvin. Hedden bent over and struck Earvin three times with a closed fist, while a third officer kicked Earvin around the thigh.

Another inmate saw this beating as he spoke to his girlfriend on the phone. He narrated: "They beatin' him up; they stompin' this man." Officers then picked Earvin up and led him out of the R1 vestibule and toward the segregation unit. At this point the injured Earvin needed assistance to walk.

Sheffler stepped in to relieve another officer and take over the escort. At that point five officers were assisting, and a sixth officer was following them. They approached the entryway to segregation, which like the R1 vestibule had no security cameras. It was known that "beatdowns" happened there.

In this second blind spot the officers again assaulted Earvin. The parties dispute Sheffler's precise involvement, but multiple officers testified to his participation. Hedden opened the exterior door to segregation and the interior door remained closed. Then Hedden saw Sheffler shove Earvin through the exterior door into the interior door. Earvin landed headfirst at the base of the interior door. Hedden then saw Banta and Sheffler "stomping and kicking" Earvin, as well as

Banta repeatedly "dropping himself with both knees" onto Earvin. Another officer's recollection differed somewhat, with Banta throwing Earvin into the door, punching him, and jumping on his rib cage. In that officer's version, Sheffler played a more passive role, not visibly throwing or kicking Earvin. A third officer saw kicks and punches aimed at Earvin but could not tell who struck which blows. In contrast, a fourth officer observed Banta and Sheffler "stomping" Earvin with their feet as he lay handcuffed on the floor.

After these assaults, Earvin could no longer walk, was covered in blood, and appeared unconscious. He was carried from the segregation entryway to a holding cell. Staff then moved Earvin to the prison's health care unit, and soon after transferred him to the hospital. Forty days after the assault Earvin died from his injuries.

*False statements*. Following the assault, Sheffler immediately prepared an incident report that was false. It recounted that "Inmate Earvin dropped to his knees and tried to pull away while being escorted." Sheffler did not mention any incident in the segregation unit, let alone a beating. The next day, the state police interviewed numerous correctional officers, including Sheffler. None of them mentioned an assault in segregation. Sheffler denied seeing any "physical altercation" between Earvin and staff: "[W]e kept pulling him up off the ground. That was about it." Sheffler also denied hearing any "rumors" about officers getting "a little aggressive" with Earvin. Sheffler named only one other officer from Earvin's escort, Banta, whom he described as "decent" and a "good officer."

*Federal criminal charges*. For their roles in the beatings and the investigation, a grand jury indicted Sheffler, Hedden, and

Banta with numerous federal crimes. Sheffler was named in five counts:

1. Conspiracy to Deprive Civil Rights in violation of 18 U.S.C. § 241 and 18 U.S.C. § 2;
2. Deprivation of Civil Rights in violation of 18 U.S.C. § 242;
3. Conspiracy to Engage in Misleading Conduct in violation of 18 U.S.C. § 1512(k), 18 U.S.C. § 1512(b) and 18 U.S.C. § 2;
4. Obstruction–Falsification of Document in violation of 18 U.S.C. § 1519; and
5. Obstruction–Misleading Conduct in violation of 18 U.S.C. § 1512(b)(3).[1]

*Proffer agreement.* Before his first trial, Sheffler requested and signed a proffer agreement with the government. He agreed to "be completely truthful about the facts" and not to "conceal or minimize his own actions or involvement in any offense." Violation of the agreement carried harsh consequences. If Sheffler knowingly made any false statements or omissions, the government would be entitled to use those statements to start and support a criminal prosecution. After signing the agreement, Sheffler answered questions in several FBI interviews.

The first jury trial for Sheffler and Banta occurred in March and April 2022. At that trial the government did not elicit Sheffler's statements during the interviews. Banta was found guilty of several crimes, including Counts 1–3 listed above, but the jury hung on the charges against Sheffler. The

---

[1] Hedden pleaded guilty to Counts 1–3 of the indictment in March 2021, before the first jury trial of Sheffler and Banta.

government subsequently moved to revoke the proffer agreement, seeking to admit Sheffler's interview statements at the second trial. The district court granted this motion, pointing to three ways Sheffler had obfuscated during the FBI interviews.

First, Sheffler said that "through his peripheral vision," he saw Banta jumping and landing on Earvin. This conflicted with a later statement that Sheffler did not see Banta land blows on Earvin, but it was "possible" Banta did so. It also conflicted with Sheffler's claim that the incident could be an "honest mistake." The court saw these three statements as mutually exclusive, demonstrating that Sheffler did not tell the truth. Second, Sheffler denied knowledge of any injuries to Earvin before other staff took him to the health care unit. Given the extent of Earvin's injuries, the court concluded that it was impossible for Sheffler to be completely blind to them. Third, Sheffler denied contacting Banta after the beatings. But phone records show he called Banta that day and twice more in the coming days, with two of the three calls being answered.

As a consequence of these false denials, the district court ruled that Sheffler had violated the proffer agreement and that his statements during the FBI interviews could be admitted into evidence at the second jury trial.

*Juror bias allegations*. During Sheffler's second trial in August 2022, his wife claimed she overheard a conversation among prospective jurors and one of them say: "Two of them have already been convicted." Sheffler's wife identified one of the prospective jurors as Juror 31. The magistrate judge who conducted voir dire had previously questioned Juror 31, who denied having any discussions about the case.

Later during the second trial, the government learned that a juror from the first trial was watching the second trial from an overflow room. After the first jury hung on the charges against Sheffler, that former juror had called the outcome a "travesty" and said that Sheffler should have been convicted. Of particular concern, the government learned that the former juror may have spoken to Juror 31 after the first trial. Such a conversation could threaten the second jury's impartiality.

The government followed up with the former juror and learned that after the first trial was over, she had shared texts and phone calls about the first trial with Juror 31's wife, but that she had not spoken with Juror 31 himself. The district judge then heard statements from the parties and questioned Juror 31 apart from the other jurors:

> THE COURT: … Did you have any prior aware-
> ness about anything about this case?
> JUROR NUMBER 31: No.
> THE COURT: Have you ever had any discus-
> sions about this case with anyone?
> JUROR NUMBER 31: No.
> THE COURT: Including your family, your
> wife?
> JUROR NUMBER 31: Correct.
> THE COURT: … Did you have any conversa-
> tions with any of the other jurors about this
> case, either before being sworn in or after?
> JUROR NUMBER 31: No. I have not.[2]

---

[2] The magistrate judge questioned Juror 31 on August 2, 2022. The government raised with the district judge the former juror's contact with

After this exchange, Sheffler's counsel expressed concern that the former juror's statements may have influenced Juror 31 and asked to reserve the juror bias issue for additional research. The district judge rejected this request: "I think the issue has already been blown, quite frankly. You didn't assert it for cause at the time. I certainly, hearing this colloquy, got nothing that would permit an excuse for cause." Juror 31 remained on the jury throughout the second jury trial.

*Prosecution's rebuttal argument.* The second jury trial lasted 15 days. Toward the end, the prosecution began its rebuttal closing argument by recounting defense counsel's opening statement:

> [A]t the beginning of this trial, right after you took an oath, [defense counsel] stood before you and asked you to imagine … having your grandmother accused of robbery, and she equated that to the presumption of innocence, which drew an objection that the Court sustained.

Defense counsel had asked the jurors to think of Sheffler as their "best friend" or "grandma," drawing another sustained objection. Then defense counsel said: "What would it take to convince you of someone you love of their guilt?" and again drew a sustained objection.

In the rebuttal the prosecutor recounted each of these sustained objections. Defense counsel objected, asking "Am I on trial, or is Mr. Sheffler on trial?" The objection was overruled,

---

Juror 31's wife on August 4, 2022. The district judge questioned Juror 31 on August 5, 2022.

and the prosecutor continued: "There is nothing more unsupported or discrediting of an attorney's statements than when the Court instructs a jury to disregard them. But that is how the defense of Todd Sheffler began."

Later in the rebuttal, the prosecutor again looked back to the defense opening statement, in which defense counsel had claimed guards beat Earvin while leading him out of D Wing. According to the prosecution, this turned out to be false, as "[t]here was no beating or assaulting of Mr. Earvin on D Wing."

Toward the end of the rebuttal, the prosecution spoke to Sheffler's FBI interviews. Defense counsel had previously argued that Sheffler could not intervene to stop the beating, as his "back was to everything that was happening" and Sheffler "consistently said that." The prosecutor argued the defense's interpretation of events contradicted Sheffler's past statements:

> This business … about he didn't have an opportunity to intervene is just not supported by what he said when he was interviewed by the State Police and by the FBI. Over and over again. He had multiple opportunities. He had the … obligation to be complete and truthful. He had months prior to the Indictment to come forward, as he was obligated to do, to provide complete and truthful information.

In response, defense counsel objected to the government undermining the defendant's right to silence. The court sustained the objection and asked the prosecutor to "wrap it up."

*Convictions*. At the end of the second trial the jury found Sheffler guilty of the five counts with which he was charged. He moved for a judgment of acquittal and for a new trial. The district court denied both motions, and Sheffler appeals.

## II. Discussion

Sheffler offers several arguments on appeal. First, he contends the government introduced no evidence from which a jury could find a reasonable likelihood that his incident report or interview with the state police would reach federal officials. Insufficient evidence therefore existed, he says, for his convictions under the federal statutes he was charged with violating in Counts 3–5 of the indictment.

His other arguments concern his second trial. He submits the district court should not have permitted the government to revoke his proffer agreement, allowing his interview statements to be used. Further, Juror 31 should have been dismissed, he says, because of suspicions that Juror 31 had discussed the case with others, as well as due to contacts a juror from the first trial had with Juror 31's wife. Sheffler also alleges the prosecutor engaged in misconduct during the rebuttal closing argument by disparaging his attorney, misrepresenting evidence, and commenting on his right to remain silent.

Sheffler believes these errors—either individually or cumulatively—denied him a fair trial and should result in his acquittal.

### A. Sufficiency of the Evidence

Sheffler first challenges the district court's rejection of his motion for a judgment of acquittal, which we review de novo. *United States v. Griffin*, 76 F.4th 724, 741 (7th Cir. 2023). This

review is highly deferential. We will overturn the jury verdict only if "the record contains no evidence, regardless of how it is weighted, from which the jury could find guilt beyond a reasonable doubt." *United States v. Rivera*, 901 F.3d 896, 900–01 (7th Cir. 2018) (quoting *United States v. Peterson*, 823 F.3d 1113, 1120 (7th Cir. 2016)).

In Counts 3 and 5 of the indictment Sheffler was convicted of violating 18 U.S.C. § 1512(b)(3) and (k), provisions in this witness tampering statute. Section 1512(b)(3) makes it a federal offense to: "engage[] in misleading conduct toward another person, with intent to … hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense." Section 1512(k) makes it a federal offense to "conspire[] to commit any offense under this section."

At issue is what § 1512 requires to implicate a federal investigation. *Fowler v. United States*, 563 U.S. 668 (2011), is important to this interpretation. There, the Supreme Court evaluated a different part of the same statute—§ 1512(a)(1)(C)—which criminalizes "kill[ing] another person, with intent to … prevent the communication by any person to a law enforcement officer … of the United States." *Fowler*, 563 U.S. at 670. The defendant intended to prevent communication "to law enforcement officers in general rather than to some specific law enforcement officer or set of officers which the defendant has in mind." *Id.* at 672 (emphasis omitted). Though the defendant killed to prevent communication to all officials, he lacked the particular intent to prevent communication to federal officials. *See id.* The Court held that such "broad indefinite intent" is not enough. *Id.* at 674. Rather, where the defendant

acts without particular officers in mind, "the Government must show *a reasonable likelihood* that, had, *e.g.,* the victim communicated with law enforcement officers, at least one relevant communication would have been made to a federal law enforcement officer." *Id.* at 677 (emphasis in original).

This reasonable likelihood requirement elucidates the statute and its application. Given the broad scope of federal crimes, a more permissive standard "would transform a federally oriented statute into a statute that would deal with crimes, investigations, and witness tampering that, as a practical matter, are purely state in nature." *Id.* Despite these guardrails, *Fowler*'s bar is low: "the Government must show that the likelihood of communication to a federal officer was more than remote, outlandish, or simply hypothetical," although how much more has been left to the lower courts. *Id.* at 678; *see United States v. Smith*, 723 F.3d 510, 517–18 (4th Cir. 2013) (reiterating that "reasonable likelihood" in this context is "a relatively low bar"); *Bruce v. Warden Lewisburg USP*, 868 F.3d 170, 185 (3d Cir. 2017) (same).

The relevant question for us is whether, when Sheffler made false statements in his incident report and during the police interviews, there was a reasonable likelihood they would reach federal officials.

Before answering that question, though, a preliminary issue arises. *Fowler* addressed only § 1512(a)(1)(C), which criminalizes witness tampering by murder. 563 U.S. at 670. Does *Fowler*'s reasonable likelihood standard also guide our interpretation of the statute under which Sheffler was convicted— § 1512(b)(3)—which criminalizes misleading conduct?

We first compare the text of each statute. The subsection in *Fowler*, § 1512(a)(1)(C), criminalizes **(1)** "kill[ing] or attempt[ing] to kill another person" **(2)** "with intent to" **(3)** "prevent the communication by any person to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense … ." (bolded numbered parentheses supplied).

The statute here, § 1512(b)(3), similarly criminalizes **(1)** us[ing] intimidation, threaten[ing], or corruptly persuad[ing] another person, or attempt[ing] to do so, or engag[ing] in misleading conduct toward another person" **(2)** "with intent to" **(3)** "hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense … ." (bolded numbered parentheses supplied).

These parallel provisions—composed of similar elements and situated next to each other in the criminal code—are properly evaluated under the same standard. *See Ortiz-Santiago v. Barr*, 924 F.3d 956, 961–62 (7th Cir. 2019) (a phrase appearing multiple times in a statute is intended to have a consistent meaning); ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 170 (2012) (under the presumption of consistent usage, words and phrases are "presumed to bear the same meaning throughout a text").

This conclusion is consistent with the reasoning of other circuits, which have deemed § 1512(a)(1)(C) and § 1512(b)(3) "investigation-related provision[s] aimed at protecting the communication of information to law enforcement." *United States v. Shavers*, 693 F.3d 363, 378–79 (3d Cir. 2012); *see also United States v. Veliz*, 800 F.3d 63, 74 (2d Cir. 2015) (using the

same "investigation-related provision" language); *United States v. Johnson*, 874 F.3d 1078, 1081 (9th Cir. 2017) (same). These investigation–related statutory provisions fall within the same "line[] of jurisprudence," so courts should evaluate them under the same test. *Shavers*, 693 F.3d at 379; *see also Lobbins v. United States*, 900 F.3d 799, 802 (6th Cir. 2018) (holding that "reasonable likelihood" standard applies to § 1512(a)(2)(C) just as it applies to § 1512(a)(1)(C), because "absent good reason to do otherwise, we give the same words the same meaning throughout the same statute").

Based on the analogous text in the two provisions, the contextual canon of the presumption of consistent usage, and the decisions of other circuits, the reasoning in *Fowler* as to § 1512(a)(1)(C) can be extended to § 1512(b)(3). The reasonable likelihood standard thus applies to Sheffler's case. We return then to the question of whether sufficient evidence was introduced at trial under that standard to support his convictions on Counts 3–5.

This court has addressed this standard from *Fowler* only once, in *United States v. Snyder*, 865 F.3d 490 (7th Cir. 2017). There, the defendant conspired to murder a potential witness to cover up a convenience store robbery. *Id.* at 493–94. Though initially charged in state court, that case was dismissed after federal officials pursued federal charges, including Hobbs Act robbery under 18 U.S.C. § 1951(a) and conspiring to kill a witness in violation of 18 U.S.C. § 1512(a)(1) and (k). *Id.* at 494. Snyder pleaded guilty to robbery and other crimes, but he took the conspiracy to murder a federal witness charge to jury trial and was convicted. *Id.* at 494–95.

*Snyder* "outline[d] two separate paths the government can take to show the required federal nexus under § 1512 … ." *Id.*

at 497. "First, if the underlying crime … would have been prosecuted in federal court, then it is reasonably likely that the witness would have spoken with a federal officer during the course of that prosecution." *Id.* "Second, even if the underlying crime would not have been prosecuted in federal court, the government can still satisfy § 1512 by showing a reasonable likelihood that the victim would have communicated with a federal officer who was assisting the state prosecution of the underlying crime." *Id.* The district court in *Snyder* relied on the second path to deny Snyder's motion for judgment of acquittal. *Id.*

This court reversed, concluding that the evidence was insufficient on either path. *Id*. at 497–99. First, though the robbery could be prosecuted in state or federal court, that does not satisfy § 1512, because out of hundreds of commercial robberies in that federal district, only six were prosecuted federally. *Id.* at 498. Second, state police and the FBI shared office space and could possibly discuss an armed robbery, and federal officials provided technical investigative assistance. But that did not show a reasonable likelihood that the deceased would have communicated with a federal employee. *Id.*

In *Snyder*, the federal offense of killing a witness happened after the underlying felonies, including the robbery, had been completed. In contrast, here the crime remained the same—Sheffler's participation in the beating and then covering it up. This case travels the first of the two paths laid out in *Snyder*, inquiring whether the underlying crime would have been prosecuted in federal court, and then asking if it is reasonably likely that the witness would have communicated with a federal officer during that federal prosecution.

This is where the facts in *Snyder* fall short of the stronger federal nexus the government provided at Sheffler's second trial. Consider that Sheffler's incident report was written on an official Department of Corrections form, which was reviewed by supervisors and kept in the regular course of business. A false report therefore would be preserved for any potential investigation, including a federal one. Further, Illinois corrections officers including Sheffler took an oath to obey "all state and federal laws" and to "uphold the Constitution of the United States." Their code of conduct explicitly stated they must comply with "state and federal laws." This placed Sheffler on notice that civil rights violations could be investigated. And Sheffler's federal crime—the beating to death of a prisoner while on duty as a corrections officer—was both severe and intimately tied to his position of authority. This is the type of especially serious prison assault that regularly forms the basis for federal civil rights investigations.

Witness testimony also provided this link. At trial, an FBI agent explained that deprivation of a person's civil rights under color of law is a federal offense. It was "not unusual at all," another agent testified, for the Illinois State Police to communicate with the FBI about potential federal-law violations. That agent added: the "FBI investigates violations of federal law. State Police investigates violations of state law. Sometimes they intersect; sometimes they don't. But we work with state and locals a lot, particularly on areas where there's an overlay between both systems."

FBI cooperation with state authorities came quickly here. The state police contacted the FBI about a potential federal investigation in early June 2018, within a few weeks of Earvin's assault and before Earvin died. The FBI promptly opened an

investigation. Four days before Earvin died, an FBI agent tried to interview him. He was on "breathing assistance," and could communicate "very minimally." When the agent questioned him about the incident, "he would kind of grimace in pain and cringe up toward one side." Although the key question remains the likelihood of federal involvement at the time of the misleading conduct, rapid federal investigation provides additional evidence of that likelihood. *See Veliz*, 800 F.3d at 75 (recognizing "the very fact that communication with federal officials" eventually took place may "lend[] some support to a finding that the communications were reasonably likely at the time of the [misleading conduct]"). And Sheffler's false incident report and untruthful statements during his state police interview reached the FBI in the natural progression of its investigation, not in some "remote, outlandish, or simply hypothetical" manner, as *Fowler* prohibits. 563 U.S. at 678.

From all this evidence, a jury could fairly conclude that an inmate's death at the hands of state correctional officials would be investigated by federal authorities.[3] Sheffler used his government authority to kill a person under his supervision. Crimes of great severity committed under state control are more likely to yield a federal investigation. So, it was reasonably likely that relevant communications in Sheffler's case would reach federal law enforcement.

---

[3] This court has promulgated pattern jury instructions for crimes alleged under 18 U.S.C. §§ 1512 and 1519. COMMITTEE ON FEDERAL CRIMINAL JURY INSTRUCTIONS OF THE SEVENTH CIRCUIT, THE WILLIAM J. BAUER PATTERN CRIMINAL JURY INSTRUCTIONS OF THE SEVENTH CIRCUIT (2020 ed.). The district court gave four of those instructions to the jury. Jury Instrs. 77–81, ECF No. 402.

Courts are also inclined to find reasonable likelihood of communication reaching federal officials when there is evidence of state-federal cooperation. *See United States v. Tyler*, 956 F.3d 116, 120 (3d Cir. 2020) (murdered witness had worked with a state agent who met with the DEA multiple times a month and frequently referred cases); *United States v. Smith*, 723 F.3d 510, 518 (4th Cir. 2013) (city police department worked closely with DEA and was major source of information, with testimony that even street-level drug cases came to DEA attention); *United States v. Ramos-Cruz*, 667 F.3d 487, 498–99 (4th Cir. 2012) (federal officials were previously focused on the group involved, and local officials investigating the underlying crime were actively cooperating with federal officials). The FBI agent's testimony here about "work[ing] with state and locals a lot" supports this conclusion.

Indeed, when courts decline to find reasonable likelihood that a relevant communication would make it to a federal officer, the evidence is noticeably weaker than that which the government offered here. *See United States v. Gatlin*, 90 F.4th 1050, 1064–66 (11th Cir. 2024) (defendant's misleading statements given to state public defender's office to influence state prosecution; defendant thought he faced a state law charge); *Lobbins*, 900 F.3d at 803 (federal detainee assaulted another federal detainee who had relayed information to a state prosecutor; that did not support inference that cooperating detainee was likely to talk to a federal official).

Sheffler points to *United States v. Johnson*, 874 F.3d 1078 (9th Cir. 2017), in which a § 1512(b)(3) conviction was reversed because "the Government presented minimal evidence of a federal nexus." *Id.* at 1083. Both this case and *Johnson* involved a state correctional officer using force against an inmate and

then failing to truthfully document the encounter. *Id.* at 1079–80. In *Johnson*, the government presented evidence of a "use of force" policy incorporating federal constitutional law. *Id.* at 1083. The officer also received training on the policy, so he knew that excessive force violates the Constitution, which he swore to uphold. *Id.* Aside from that, the government provided no evidence of a federal nexus. *See id.* The Ninth Circuit concluded in *Johnson* that this evidence was insufficient under *Fowler*'s reasonable likelihood standard. *Id.*

But *Johnson* differs from this case. In *Johnson* the jury knew that a state employee had committed a federal crime, but the likelihood of federal involvement remained nebulous. There is no such problem here. The government provided crucial evidence of federal involvement, including the testimony from the FBI agents as detailed above.

The reasonable likelihood standard of *Fowler* is not onerous. It requires "more than [a] remote, outlandish, or simply hypothetical" possibility of federal involvement, but declines to set the bar higher than that. 563 U.S. at 678. And when reviewing for sufficiency of the evidence, we ask whether any reasonable jury had the evidence to find guilt beyond a reasonable doubt. *Rivera*, 901 F.3d at 900–01. Given these permissive standards, each of which Sheffler must satisfy, we are not persuaded that his convictions should be reversed on Counts 3 and 5 under 18 U.S.C. § 1512(b)(3) and (k).

A related topic remains. Sheffler was convicted in Count 4 of violating 18 U.S.C. § 1519, which provides:

> Whoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible

> object with the intent to impede, obstruct, or in-
> fluence the investigation or proper administra-
> tion of any matter *within the jurisdiction of* any
> department or agency of the United States …
> shall be fined … imprisoned … or both.

(emphasis supplied). We have not previously addressed what standard applies when determining whether a matter falls "within the jurisdiction of" the federal government. Sheffler argues that *Fowler*'s reasonable likelihood standard applies to § 1519, the same as it does to § 1512.

"The most natural grammatical reading of the statute is that the term 'knowingly' in § 1519 modifies only the surrounding verbs: 'alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry.'" *United States v. Yielding*, 657 F.3d 688, 714 (8th Cir. 2011). The term "knowingly" adds no requirement to the jurisdictional language later in § 1519. It is enough for the defendant to intend to obstruct an investigation, and on an unrelated note, for the investigation to be within federal jurisdiction.

This lines up with the usual understanding of jurisdictional elements, which typically lack a mens rea requirement. *See United States v. Feola*, 420 U.S. 671, 677 n.9 (1975) ("[T]he existence of the fact that confers federal jurisdiction need not be one in the mind of the actor at the time he perpetrates the act made criminal by the federal statute."); *United States v. Ringer*, 300 F.3d 788, 791 (7th Cir. 2002) (under 18 U.S.C. § 1001, "made knowingly and willingly" and "concerned a matter within the jurisdiction of a federal department or agency" are independent elements). *See also United States v. Cooper*, 482 F.3d 658, 664–65 (4th Cir. 2007) ("It is well settled that mens rea requirements typically do not extend to the

jurisdictional elements of a crime[.]"); *United States v. Campa*, 529 F.3d 980, 1006 (11th Cir. 2008) ("[N]o proof of mens rea is necessary for elements that are 'jurisdictional only.'"(quoting *Feola*, 420 U.S. at 676 n.9)); *United States v. McRae*, 702 F.3d 806, 835 (5th Cir. 2012) ("[T]he mens rea of a federal criminal statute does not ordinarily extend to the statute's jurisdictional elements.").

Other circuits considering this issue have unanimously reached the same conclusion. *See United States v. Hassler*, 992 F.3d 243, 247 (4th Cir. 2021) ("Every circuit to address [§ 1519] … has concluded that knowledge of a federal investigation under § 1519 is a jurisdictional element and not a separate mens rea requirement that the jury must specifically find."); *United States v. Gonzalez*, 906 F.3d 784, 795 (9th Cir. 2018) ("To sustain a conviction under § 1519, it is enough for the government to prove that the defendant intended to obstruct the investigation of any matter as long as that matter falls within the jurisdiction of a federal department or agency."); *United States v. Gray*, 692 F.3d 514, 519 (6th Cir. 2012) (same); *United States v. Moyer*, 674 F.3d 192, 208–09 (3d Cir. 2012) (same); *Yielding*, 657 F.3d at 714 (same).

We join these other circuits in reading § 1519 as containing a pure jurisdictional requirement, with no federal intent component. *Fowler*'s reasonable likelihood standard therefore does not apply to Sheffler's conviction under § 1519.

Sheffler conspired to and engaged in misleading conduct by knowingly filing a false incident report describing Earvin's escort, as well as by falsely denying he knew about, witnessed, and participated in the assault of Earvin during his interview with the Illinois State Police. So, Sheffler's convictions on Counts 3–5 stand.

### B. Proffer Agreement

Sheffler also disputes the district court's revocation of his proffer agreement with the government before the first jury trial. He says he provided truthful and complete information during his FBI interviews, so the court erred when it found that Sheffler breached the agreement and permitted the government to introduce the proffered statements at his second jury trial.

A proffer agreement is "considered to be a contract," and, like any other contract, "must be enforced according to its terms." *United States v. Reed*, 272 F.3d 950, 954 (7th Cir. 2001). Breach permits the government to use proffered statements at trial. Absent breach, those statements remain excluded. The district court concluded that Sheffler was not truthful in three ways—about his knowledge and participation in the assault, that he knew Earvin was injured, and about Sheffler's contacts with Banta after the incident. Sheffler disputes these conclusions. As with any other contract, breach is a factual determination, so we review the district court's conclusions for clear error. *See id.* at 953.

Sheffler says he spoke truthfully when he denied he saw Banta assault Earvin. Sheffler correctly points out that witnesses recalled the assault with varying details and precision. Indeed, Sheffler himself describes the incident in different ways. Seeing something through one's "peripheral vision" is not far from being unsure something occurred, especially during a heated incident. And when asked for his opinion, Sheffler described Banta's actions as a potentially "honest mistake." That statement about Banta's state of mind does not directly contradict Sheffler's other statements.

But as to Sheffler's insistence that he did not observe Earvin's injuries, there is little room for honest disagreement. After the assault, other officers saw Earvin unconscious with blood on his shirt. Many of Earvin's injuries from the officers kicking him and jumping on his chest were internal. Yet, given Sheffler's close proximity to Earvin during the assault, the extent of the injuries, and others' recollection of bleeding, Sheffler's wholesale denial of seeing injuries is untenable.

That Sheffler falsely denied contacting Banta post-incident is even more clean cut. Sheffler claims on appeal that it makes "perfect sense" not to "recall two fleeting calls over a year later." But these phone calls took place the day of the assaults and immediately afterward, when Sheffler and Banta had a pressing need to coordinate a consistent story. The district court's finding that Sheffler made false statements about the phone calls follows naturally from the context of those calls.

The government provided ample evidence that Sheffler was not truthful in his FBI interviews, at least about Earvin's injuries and his phone calls with Banta. The district court did not clearly err in concluding that Sheffler had breached the proffer agreement, and by allowing the government to offer Sheffler's statements at trial.

## C. Juror Bias

Sheffler next argues that the district court erred by not dismissing a juror he contends was biased, depriving him of his right to a fair trial. We "review a district court's decisions concerning jury impartiality for an abuse of discretion." *United States v. Howard*, 692 F.3d 697, 707 (7th Cir. 2012). That review is deferential to the district court, which is best equipped to assess the credibility and demeanor of jurors. *United States v.*

*Brodnicki*, 516 F.3d 570, 574 (7th Cir. 2008); *see also United States v. Granger*, 70 F.4th 408, 411 (7th Cir. 2023) (noting that trial judges "can hear the prospective juror's tone of voice" and "see the prospective juror's facial expressions and body language," credibility indicators unavailable on appellate review). As a remedy Sheffler requests a new trial.

Twice questions arose as to whether a juror who sat on the second trial may be biased.

The record shows that during jury selection, Juror 31 was questioned and denied discussing the case with others. There is no basis for us to question the magistrate judge's handling of this topic during voir dire, or for us to conclude that the juror was untruthful or harbored any bias against Sheffler.

Then, early in the second trial, new information was brought to the court prompting further investigation. The court was informed that a juror from the first trial had communicated with Juror 31's spouse. The government investigated and told the court that the former juror admitted to texting about and discussing the case with Juror 31's wife. But the former juror denied discussing the case with Juror 31. When the district judge questioned Juror 31 on this point, he confirmed he had not discussed the case with anyone, including his wife. Sheffler has not provided any basis to assume Juror 31's answers were unreliable.

The district judge spoke directly with Juror 31 and was in the best position with the best information to assess his credibility. The district judge saw "nothing that would permit an excuse for cause" and declined to remove Juror 31. None of the information gleaned raised concerns about bias. These

circumstances were carefully and properly handled, including the questioning of Juror 31.

Sheffler also contends the district court incorrectly rejected his jury bias concerns as untimely. The court stated, "the issue has already been blown, quite frankly." This could be interpreted as a failure to timely move to strike Juror 31 before trial. If so, this could raise a problem, as the former juror's concerning statements arose only after the second trial had started. But the court investigated those new concerns and concluded that there was no evidentiary basis to dismiss Juror 31. This shows Sheffler's allegation of juror bias was fairly and reasonably considered on the merits.

The circumstances involving Juror 31 were serious. A court faced with a similar situation must be careful about any possible intrusion into juror fairness, including a potential juror's discussions with a spouse exposed to extra-record information. Still, we conclude that the district court here thoroughly vetted this matter and did not abuse its discretion.

### D. Prosecutorial Misconduct

Sheffler next contends the district court erred in refusing to grant his motion for a new trial based on prosecutorial misconduct. He criticizes three statements by the prosecutor during the rebuttal closing argument, the final words the jury heard from either party. According to Sheffler, the prosecutor disparaged defense counsel, misrepresented evidence by denying an assault in D Wing, and undermined Sheffler's right to remain silent. These comments deprived him of a fair trial, Sheffler submits. To prevail, he must show the district court abused its discretion by not granting a new trial. *United States v. Bloom*, 846 F.3d 243, 254 (7th Cir. 2017).

A claim of prosecutorial misconduct is reviewed in two steps. Initially, we "determine whether the prosecutor's re-mark was improper." *United States v. Hale*, 448 F.3d 971, 986 (7th Cir. 2006). Then, if misconduct is found, the court as-sesses whether the conduct prejudiced the defendant. *Id.* at 986; *United States v. Washington*, 417 F.3d 780, 786 (7th Cir. 2005).

First, Sheffler takes issue with the prosecutor highlighting objections that had been sustained during the defense closing argument. Defense counsel misstated the presumption of in-nocence by asking the jury to think of Sheffler as a close friend or relative. The prosecutor addressed this topic on rebuttal, clarifying that defense counsel's statements were incorrect, as confirmed by the court sustaining objections to those state-ments.

Though "[a]ttorneys should not attack opposing counsel personally … they may criticize opposing counsel's tactics and the strength of the evidence." *United States v. Gan*, 54 F.4th 467, 480 (7th Cir. 2022). For example, prosecutors may go so far as to call opposing counsel's argument "made up" or "lu-dicrous." *Id.* (quoting *Washington*, 417 F.3d at 786–87). The prosecutor's reminder to the jury about the sustained objec-tions is problematic, and we do not encourage such a com-ment. Still, the prosecutor's critique was limited to defense counsel's particular statements; it did not extend to personal attacks. For that reason, there was no prosecutorial miscon-duct.

Even if this statement by the prosecutor was improper, it did not prejudice Sheffler. At the trial's beginning and end, the district court instructed the jury that the lawyers' state-ments, arguments, and objections are not evidence. And the

rebuttal argument came at the close of a 15-day trial, in which multiple witnesses testified to Sheffler's participation in the fatal beating. So, brief comments about defense counsel's credibility are unlikely to have affected the jury's verdict.

Sheffler's second claim—that in the rebuttal argument the prosecutor misrepresented the evidence—fares no better. Sheffler contends the prosecutor claimed Earvin was not beaten or assaulted in D Wing of the prison. But Sheffler overlooks the distinction between D Wing and the R1 entryway. The prosecutor never disputed that an assault occurred in the R1 entryway. But as to D Wing, where video footage is unclear and witness memories less certain, the assault was disputed. The prosecutor's denial of an assault precisely in D wing is not necessarily inconsistent with the evidence.

Prosecutors "may argue reasonable inferences from the evidence that the jury has seen and heard." *United States v. Waldemer*, 50 F.3d 1379, 1383 (7th Cir. 1995); *Evans v. Jones*, 996 F.3d 766, 775 (7th Cir. 2021). If the inferences are weak, the jury is free to disregard the prosecutor's claims. As noted, the jury was instructed that lawyer's statements are not evidence, and "the evidence is what counts." So, even if during the rebuttal the government misrepresented where the beating occurred, there was no prejudice. The jury could recall the evidence, as instructed, and give evidence about a D Wing beating its proper weight. Our review is also for plain error, as Sheffler did not object to the prosecutor's statement. *See United States v. Echols*, 104 F.4th 1023, 1025 (7th Cir. 2024). Given the amount of inculpatory evidence at trial, Sheffler cannot show that this statement made his trial fundamentally unfair.

Third, Sheffler claims the prosecutor undermined his right to remain silent by arguing he had "multiple opportunities" to intervene and an "obligation to be complete and truthful." But in context, the prosecutor's statements did not undermine Sheffler's right to silence. Rather, the prosecutor was pointing to the conflict between Sheffler's arguments at trial and his statements before trial. During closing arguments, Sheffler's counsel said that Sheffler's "back was to everything that was happening" and he "consistently said that" to the FBI. By making this claim, Sheffler opened the door to questions on his statements in the FBI interviews. The prosecutor was permitted to set the record straight as to what Sheffler shared—and failed to share—when speaking with law enforcement. The prosecutor was speaking to commentary and statements by the defense. That is not commenting on Sheffler's constitutionally protected silence.

Even if the prosecutor's statement was construed as commenting on Sheffler's silence, any error would be harmless. The district court instructed the jury on the defendant's right not to testify, which would address any concerns about this statement. Further, we do not consider the rebuttal argument in isolation. It is viewed in the context of the entire trial and numerous witnesses who testified to Sheffler's conduct. The prosecutor's brief and somewhat cryptic comment about Sheffler's silence cannot hold up to the overwhelming amount of evidence inculpating him.

The prosecutor committed no misconduct during the rebuttal argument. And we cannot see how the prosecutor's comments would have swayed the jury's verdict. The denial of a motion for a new trial on this contention was not an abuse of discretion.

Finally, Sheffler asserts cumulative error at his second trial. To succeed on such a claim, he must show "(1) that multiple errors occurred at trial; and (2) those errors, in the context of the entire trial, were so severe as to have rendered his trial fundamentally unfair." *United States v. Powell*, 652 F.3d 702, 706 (7th Cir. 2011). We reject this assertion, not just because we have found no reversible errors at trial, but in "light of the quantity and quality of evidence of [the defendant's] guilt adduced at trial." *Id*. at 707.

### III.  Conclusion

The evidence at trial was sufficient to show a reasonable likelihood that Sheffler's statements would reach federal officials, and thus that he violated 18 U.S.C. § 1512, prohibiting witness tampering, and 18 U.S.C. § 1519, forbidding falsifying records in a federal investigation.

The district court also did not clearly err in concluding that Sheffler had breached the proffer agreement, and by allowing the government to offer Sheffler's statements at trial. Nor did the district court abuse its discretion by denying his motion for a new trial. For all these reasons, we AFFIRM.